## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Kathleen Mills and Wilson Mills, | Case No. 19-cv-2859 (SRN/ECW) |
| Plaintiffs, | |
| v. | **MEMORANDUM ORDER AND OPINION** |
| Mayo Clinic and Scott Kelley, | |
| Defendants. | |

Michael Kemp, Hansen Dordell, 3900 Northwoods Drive, Suite 250, Saint Paul, MN 55112, for Plaintiffs.

Anupama D Sreekanth, Fredrikson & Byron, P.A., 200 South 6th Street, Suite 4000, Minneapolis, MN 55402; Gregory E Karpenko, Fredrikson & Byron, P.A., 200 South 6th Street, Suite 4000, Minneapolis, MN 55402; Matthew J Hanzel, Mayo Clinic Legal Dept, 200 1st St SW, Rochester, MN 55905 for Defendants.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the court on Defendants' Motion for Partial Summary Judgment (the "Motion") [Doc. No. 35]. Based on a review of the files, submissions, and proceedings herein, and for the reasons set forth below, the court GRANTS IN PART and DEFERS IN PART the Motion.

## I.   BACKGROUND

### A.   Factual Background

On November 7, 2015, Plaintiff Kathleen Mills ("Ms. Mills") presented to the emergency department at Mayo Clinic Health System-Red Wing with complaints of severe abdominal pain, chills, constipation, and nausea. (Pavelko Decl. [Doc. No. 38] Ex. A ("K.

Mills Dep.") at 14; 16.) Dr. David Claypool, an emergency department physician, examined Ms. Mills and ordered a CT scan of her abdomen. (*Id.* at 16–18.) The CT scan showed that Ms. Mills had a severe case of diverticulitis with an abscess. (Kemp Decl. [Doc. No. 44] Ex. C ("Claypool Dep.") at 32.) The radiologist opined that Ms. Mills' case of diverticulitis "would be challenging to control with percutaneous drains." (*Id.* at 31.)

Dr. Claypool testified that he does not specifically recall treating Ms. Mills. (*Id.* at 15.) Ms. Mills recalls that Dr. Claypool described her condition to her, and then explained that he was not a specialist in diverticulitis and that he wanted her to see a colorectal surgeon. (Pavelko Decl., K. Mills Dep. at 17–19.) Dr. Claypool testified that he then conferred with the general surgeon at Mayo Clinic Health System-Red Wing who "declined to accept" Ms. Mills, as he believed that her case was too complicated for the Red Wing facility. (Kemp Decl., Claypool Dep. at 48.)

Dr. Claypool then transferred Ms. Mills to the on-duty colorectal surgeon at Mayo Clinic Rochester, Dr. Kelley. (*Id.* at 15.) Dr. Claypool worked with a nurse at Mayo Clinic's admission transfer center to arrange the transfer. *(Id.* at 47.) He does not recall his conversation with Dr. Kelley, but when reviewing the transfer documents at his deposition, he testified that they indicated a "very brief" and "very routine" conversation. (*Id.* at 48.) Dr. Claypool's standard practice "would have been expressing [his] conclusion that they had a complicated situation that was beyond what Red Wing could do." (*Id.* at 38; 48.) His standard practice would then be to explain to the patient that she needed to be seen by a specialist in order to ensure the best outcome. (*Id.* at 48.) In this case, that meant referring her to a colorectal surgeon at Mayo Clinic (*Id.*)

2

Both Ms. Mills and her husband testified that Dr. Claypool explicitly told them that he was transferring her to Mayo Clinic Rochester for surgery. (Kemp Decl. Ex. B ("W. Mills Dep.") at 18; Kemp Decl. Ex. A ("K. Mills Dep.") at 21.) Dr. Claypool does not recall this conversation in particular, but testified that his standard practice would not be to "speculate on what would happen next." (Pavelko Decl. Ex. B ("Claypool Dep.") at 52.) He also testified that he was not qualified to determine the best treatment option for Ms. Mills. (*Id.*)

Ms. Mills was then transported to Mayo Clinic Rochester by an ambulance equipped with advanced life support, expecting the possibility of surgical intervention that night. (Kemp Decl., Claypool Dep. at 43.) When she arrived, she was "stable" but "very debilitated" and unable to walk. (Pavelko Decl. Ex. C, ("Kelley Dep.") at 57.) The interventionist radiologist at Mayo Clinic Rochester reviewed Ms. Mills' CT scan and determined that she was "an appropriate candidate for percutaneous drainage of [the] abscess." (*Id.*) Dr. Kelley explained that because Ms. Mills was stable, not septic, had numerous comorbidities, and was debilitated upon her arrival, surgery would not be recommended. (*Id.* at 58–59.) Instead, medical staff would attempt to "get [Ms. Mills] recovered" for potential surgery by placing percutaneous drains. (*Id.* at 59.) Dr. Kelley did not see Ms. Mills that evening. (Kemp Decl., K. Mills Dep. at 23.) The next day, November 8, 2015, Dr. Kelley explained his proposed treatment plan to Ms. Mills and her husband, and Ms. Mills agreed with the treatment plan. (*Id.* at 29.)

Ms. Mills underwent the CT-guided drainage on November 9, 2015. (Pavelko Decl. Ex. F ("Carlson Report") at 3.) On November 13, Mayo Clinic Rochester performed a

sinogram on Ms. Mills that showed "an undrained abscess cavity," "a malformed drain[,] and the drain occluded with debris." (*Id.* at 3.) Mayo Clinic Rochester changed the drain, and a sinogram three days later indicated the drain was controlling the "process reasonably well." (*Id.* at 4.) Mayo Clinic Rochester discharged Ms. Mills to Kinnic Health and Rehab ("Kinnic") in River Falls, Wisconsin for further care on November 17, 2015. (Pavelko Decl., K. Mills Dep. at 37–38.) Mayo Clinic Rochester scheduled a follow up appointment for November 30, 2015. (*Id.* at 40.) At the time, Ms. Mills was comfortable with the plan in place to address her diverticulitis. (*Id.* at 45.)

A few days later, on November 23, 2015, Kinnic sent Ms. Mills to an emergency room at the River Falls Area Hospital with a fever. (*Id.* at 49.) The hospital performed a CT scan and found Ms. Mills' drains were "well placed." (*Id.* at 51–52.) At this point, Ms. Mills became dissatisfied with the treatment option provided by Dr. Kelley. (*Id.* at 45.) When Ms. Mills returned for her follow up appointment with Dr. Kelley on November 30, 2015, she was experiencing abdominal pain and felt weak. (*Id.* at 57.)

Dr. Kelley performed surgery on Ms. Mills on December 1, 2015. (*Id.* at 59.) Plaintiffs' medical expert, Dr. Trent Carlson, opines that because of the delay in Ms. Mills' surgery, "[t]he abscess cavity was much larger, involved more intra-abdominal organs, obliterated tissue planes, and resulted in one liter of stool being spilled into the abdominal cavity." (Pavelko Decl., Carlson Report at 4.) He also states that "[t]his greatly complicated the surgery[,] resulting in organs needing repair or removal." (*Id.*) Ms. Mills required subsequent surgeries, including an abdominal washout and closure on December 4, 2015,

a colostomy take down procedure on July 26, 2016, and a washout and exploration procedure on August 5, 2016. [1] (*Id.*)

### B.    Procedural Background

Plaintiffs initiated this action on November 8, 2018 asserting three claims: 1) negligence [medical malpractice]; 2) loss of consortium; and 3) breach of implied contract. They seek damages for "disfigurement," "medical costs," "increased risk for future injuries," and "mental and emotional distress." Defendants now move for summary judgment on the breach of implied contract claim and on the claim for medical reimbursement damages.

## II.    DISCUSSION

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, and the Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Enter. Bank v. Magna Bank of Mo*., 92 F.3d 743, 747 (8th Cir. 1996).

A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials and must set forth specific facts in the record showing that there

---

[1] Dr. Carlson's report incorrectly states that the second and third operations occurred in 2015, when they actually occurred in 2016. (Pl.s' Mem. in Opp. to Def.s' Summ. J. Mot. [Doc. No. 43] ("Pl.s' Mem.") at 17; Def.s' Reply Br. [Doc. No. 46] ("Def.s' Reply") at 7–8.)

is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016); Fed.R.Civ.P. 56(e).

### A.      Breach of Implied Contract

Defendants first move for summary judgment on Plaintiffs' breach of implied contract claim. There appears to be no evidence in the record to support Plaintiffs' argument that an implied contract existed between Ms. Mills and Dr. Kelley. *Cf. Celotex Corp.*, 477 U.S. at 322 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.") Accordingly, for the reasons discussed below, the Court finds that the Defendants are entitled to summary judgment on Plaintiffs' breach of implied contract claim.

### 1.      The Law

Under Minnesota law, a breach of contract claim has four elements: "(1) formation of a contract; (2) performance by plaintiff of any conditions precedent; (3) a material breach of the contract by defendant; and (4) damages." *Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.*, 703 F.3d 1104, 1107 (8th Cir. 2013) (quoting *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 961 (D. Minn. 2000)). The evidence in this record fails to establish the formation of an implied contract in this case.

Contract formation "requires communication of a specific and definite offer, acceptance, and consideration." *Commercial Assocs., Inc. v. Work Connection, Inc.*, 712 N.W.2d 772, 782 (Minn. Ct. App. 2006) (*citing Pine River State Bank v. Mettille*, 333

6

N.W.2d 622, 626–27 (Minn. 1983)). The subjective mental intent of the parties is not relevant in determining whether a contract was formed, instead "[t]he test of contractual formation is an objective one, to be judged by the words and actions of the parties." *Minnesota Deli Provisions, Inc. v. Boar's Head Provisions Co.*, 606 F.3d 544, 550 (8th Cir. 2010) (*quoting Hill v. Okay Constr. Co.*, 252 N.W.2d 107, 114 (Minn. 1977)).

It is true that contracts need not always be express, instead a contract "may be implied in fact where the circumstances . . . clearly and unequivocally indicate the intention of the parties to enter into a contract." *State Farm Mut. Auto. Ins. Co. v. Merrill, Tr. for P.B.*, 353 F. Supp. 3d 835, 846 (D. Minn. 2018), aff'd, 952 F.3d 941 (8th Cir. 2020) (finding no implied contract was formed when there was no showing of "clear and unequivocal" intent) (internal quotation marks omitted). Minnesota courts also appear to recognize the potential for an implied contract between a doctor and patient. *Stubbs v. N. Mem'l Med. Ctr.*, 448 N.W.2d 78, 82 (Minn. Ct. App. 1989) ("Any time a doctor undertakes the treatment of a patient, . . . [two obligations] are simultaneously assumed by the doctor. Doctor and patient enter into a simple contract, the patient hoping that he will be cured and the doctor optimistically assuming that he will be compensated.") (*quoting Hammonds v. Aetna Casualty & Surety Company*, 243 F. Supp. 793 (N.D. Ohio 1965)).

## 2.    Analysis

Plaintiffs argue that such an implied contract existed here. Ms. Mills contends that the evidence demonstrates "a request by [her] for Defendants to perform specific services (surgical intervention to treat a complicated diverticulitis), acceptance by Defendants of [her] as a patient, and the consideration of the medical bills [she] would incur for the

service." (Pl.s' Mem. at 5–6.) She further argues that Dr. Kelley agreed to accept her as a patient with the understanding that she was "choosing surgical intervention." (*Id.* at 8.) In support of this contention, Ms. Mills relies on the conversations she had with Dr. Claypool at Mayo Clinic Health System–Red Wing and her expectations therefrom, despite the fact that Dr. Claypool was not a party to this alleged contract (*Id.* at 10–12; Pavelko Decl., K. Mills Dep. at 17–18.) She further focuses on the Mayo Clinic Health System-Red Wing radiologist's observation that placement of percutaneous drains would be complicated in Ms. Mills' case, and an alleged statement by Dr. Claypool that she needed surgery "that night." (Pl.s' Mem. at 11; Pavelko Decl., K. Mills Dep. at 17.) She also claims that, based on the alleged representation by Dr. Claypool, she was being transferred for surgery. (Pl.s' Mem. at 11; Pavelko Decl., K. Mills Dep. at 17.) Importantly, there is no evidence in the record of any discussion between Ms. Mills and Dr. Kelley, the parties to the alleged contract, at the time of the transfer.

Defendants argue that Plaintiffs have failed to set forth any specific facts in the record establishing the existence of an offer or an acceptance of that offer. They correctly note that Plaintiffs have the burden of proving that Defendants made an offer to Ms. Mills to be transported to the Mayo Clinic Rochester for surgery only. (Def.s' Mem. in Support of Summ. J. [Doc. No. 37] ("Def.s' Mem.") at 7.) Nowhere in the record is there evidence that Dr. Kelley offered immediate surgery, nor that he accepted the transfer of Ms. Mills for surgery only. In fact, Ms. Mills concedes that she does not recall any promise by Mayo Clinic Rochester or Dr. Kelley that they would perform surgery only. (*Id.* at 8; Pavelko Decl., K. Mills Dep. at 30.) Instead, by Ms. Mills' own account, once Dr. Kelley examined

her and the Mayo Clinic Rochester radiologist had inspected her CT scans, Dr. Kelley told her that her diverticulitis should first be managed with percutaneous drains. (Def.s' Mem. at 8; K. Mills Dep at 24.) Ms. Mills then agreed to that course of treatment. (K. Mills Dep at 29.)

In sum, Ms. Mills fails to cite to any evidence in the record of any such agreement, express or implied, between herself and Dr. Kelley or anyone else at the Mayo Clinic Rochester. There is likewise no evidence of any conversation between Dr. Claypool and Dr. Kelley, establishing any sort of agreement as to Ms. Mills' treatment plan. Contract formation requires objective intent to enter into a contract. *Hill*, 252 N.W.2d at 114. While Ms. Mills' expectations as to the course of treatment at best show her subjective intent, they are not objective evidence of an implied contract. Even viewing the evidence in the light most favorable to Plaintiffs, the evidence here fails to create a genuine issue of material fact for trial with respect to Plaintiffs' claim for breach of implied contract.[2] Fed. R. Civ. P. 56(e).

---

[2] Defendants also argue that if an initial agreement had been reached with Ms. Mills about immediate surgery, the conversation between Dr. Kelley and Ms. Mills in which she voluntarily agreed to Dr. Kelley's use of percutaneous drains would have modified that agreement. (Def.s' Mem. at 9.) Minnesota law allows parties to alter contracts by mutual consent, *Wilson v. Hayes*, 42 N.W. 467, 471 (Minn. 1889), and modified contracts are viewed as a substitute for the initial agreement. *Wetter v. Karels*, 216 N.W. 248, 249 (Minn. 1927). Plaintiffs respond that Defendants waived this argument by not including it in their initial answer (Pl.s' Mem. at 12; *see* Def.s' Answer at ¶ 36–43); Fed .R. Civ. P. 8(c)(1). Plaintiffs also argue that Mills' agreement with Dr. Kelley was "mere acquiescence to Defendants' refusal to adhere to the contract in light of her medical situation and lack of other options." (Pl.s' Mem. at 13.) The Court need not resolve this issue because there is no evidence in the record of any initial formation of a contract, express or implied, entered into by the parties.

### B.      Medical Bills

In Plaintiffs' Complaint, Plaintiffs seek recovery of all of Ms. Mills' medical bills for her entire course of treatment. (Pl.s' Complaint at ¶ 23.) They submit an expert report from Dr. Carlson in support of their claim for reimbursement. (Pavelko Decl., Carlson Report.) Defendants move for summary judgment on this claim, arguing that the evidence of record fails to establish that all of the bills were reasonably and necessarily incurred as a result of Defendants' alleged medical malpractice. (Def.s' Mem. at 2.)

### 1.      The Law

To make out a prima facie case for medical malpractice in Minnesota, a plaintiff must demonstrate "(1) the standard of care in the medical community applicable to the particular defendant's conduct; (2) that the defendant departed from the standard of care; and (3) that the departure from the standard of care directly caused the plaintiff's injury." *Nelson v. Fairview Health Servs.*, No. A20-1134, 2021 WL 3277209, at *5 (Minn. Ct. App. Aug. 2, 2021). Critically, in order to recover her medical expenses, a plaintiff must demonstrate that her medical expenses were reasonably and necessarily incurred as a result of the doctor's malpractice. *Fabio v. Bellomo*, 504 N.W.2d 758, 762 (Minn. 1993) (finding a cancer patient unable to recover costs of her chemotherapy after a late diagnosis of breast cancer, as she would have had those costs regardless of when she was diagnosed).

To satisfy this prima facie burden, a plaintiff must usually offer expert testimony with respect to causation. *Sorenson v. St. Paul Ramsey Med. Ctr.*, 457 N.W.2d 188, 191 (Minn. 1990). The expert's report must describe the "chain of causation between the alleged violation of the standard of care and the claimed damages." *Stroud v. Hennepin*

10

*Cnty. Med. Ctr.*, 556 N.W.2d 552, 556 (Minn. 1996) (finding an expert's claim that a diagnosis delay caused a "complicated hospital stay" did not properly connect the alleged breach of the standard of care with the patient's pulmonary embolism and related costs). The expert's opinion must establish that it is "more probable than not that damages resulted from [Defendants'] malpractice." *Fabio*, 504 N.W.2d at 762. Such evidence serves the purpose of preventing juries from speculating as to the possible causes of a plaintiff's injuries. *Leubner v. Sterner*, 493 N.W.2d 119, 121 (Minn. 1992).

### 2.    Analysis

Plaintiffs did not provide an itemized list of Ms. Mills' medical expenses in their Complaint nor did they fully answer an interrogatory seeking a description of her damages. (Pavelko Decl. Ex. G ("Interrogatories") at 4; Def.s' Mem. at 9–11.) On February 23, 2021, Plaintiffs sent a settlement demand to Defendants, and for the first time set out the amount of her requested damages in the form of medical expenses. The demand includes not only expenses from Ms. Mills' initial visit at the Mayo Clinic Health System-Red Wing, but includes, as well, all of her medical expenses from Mayo Clinic Rochester, Kinnic, and subsequent providers. (Pavelko Decl. Ex. G at 1; Def.s' Mem. at 10.) Plaintiffs' demand, however, is inconsistent with their expert's report. In his report, Dr. Carlson states only that Ms. Mills' December 1, 2015 surgery was complicated by the delay, and that three subsequent surgeries were necessitated by the delay of the initial surgery: 1) an abdominal washout and closure procedure on December 4, 2015; 2) a colostomy take down procedure on July 26, 2016; and 3) a washout and exploration procedure on August 5, 2016. (Pavelko Decl., Carlson Report at 4.)

Moreover, Dr. Carlson states that "[n]ot every procedure or hospitalization which has followed [the December 1, 2015 surgery] can be directly attributed to the failure of Defendants to meet the standard of care." (Pavelko Decl., Carlson Report at 4; Def.s' Mem. at 10.) Indeed, as Plaintiffs concede, Ms. Mills suffered from diverticulitis through no fault of Defendants, needed care for her condition, and the need for the December 1, 2015 surgery is not in dispute.

Ms. Mills agrees she "cannot recover damages unrelated to Defendants' negligence." (Pl.s' Mem. at 18.) She clarifies that her request for damages is limited to the medical expenses for the three subsequent surgeries specifically identified above. (Pl.s' Mem. at 18 ("By expert testimony [Ms. Mills has] offered specific damages in the form of additional surgeries, for which Plaintiffs can present the jury with medical bills."); Pavelko Decl., Carlson Report at 4.) Accordingly, Defendants ask the Court to limit Ms. Mills' damages in the form of medical expenses to these same three procedures. (Def.s' Reply at 9.)

To ensure clarity of the record, however, the Court orders Dr. Carlson to prepare a supplemental expert report that identifies the medical expenses he claims were reasonably and necessarily incurred as a result of Defendants' malpractice, if any, over and above the three subsequent surgeries. The expert report is to be submitted to the court and served on the Defendants no later than September 30, 2021. If any disputes remain, the parties should file a joint submission identifying those issues.

### III.   CONCLUSION

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment [Doc. No. 35] is **GRANTED IN PART** (insofar as it seeks dismissal of the claim for breach of implied contract), and **DEFERRED IN PART** (as to Plaintiffs' claim for medical expenses).


Dated: September 10, 2021                     s/Susan Richard Nelson
                                              SUSAN RICHARD NELSON
                                              United States District Judge